IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS -
HOUSTON DIVISION

| | |
|---|---|
| KAMARA FRAZIER,<br><br>    Plaintiff,<br><br>v.<br><br>HOUSTON METHODIST HOSPITAL,<br><br>    Defendant. | CIVIL ACTION NO. 4:25-cv-06216<br><br>JURY TRIAL DEMANDED |

PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Kamara Frazier, ("Frazier" or "Plaintiff"), by and through her attorney of record, hereby complains of Houston Methodist Hospital ("Houston Methodist" or "Defendant"), and for causes of action would show as follows:

1. INTRODUCTION

1.1. Plaintiff complains that she was retaliated against because she opposed racial discrimination, in violation of 42 U.S.C. § 1981.

1.2. This action seeks lost wages and benefits, compensatory and punitive damages, expert witness fees, court costs, attorney's fees, pre-judgment and post-judgment interest, and all other damages permitted at law or in equity.

2. PARTIES

2.1. Plaintiff is an individual who resided in Harris County, Texas at the time the cause of action asserted herein accrued and who currently resides in Harris County, Texas.

2.2. Defendant Houston Methodist Hospital is a Delaware corporation licensed to do business in the State of Texas that may be served with process by serving its Registered Agent, C T Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201.

## 3. JURISDICTION

3.1. This action is brought under 42 U.S.C. § 2000e, *et seq.* and 42 U.S.C. § 1981.

3.2. The unlawful employment practices were committed within the jurisdiction of the United States District Court for the Southern District of Texas--Houston Division.

3.3. This Court has jurisdiction over all claims in this action. The amount in controversy is within the jurisdictional limits of this Court.

## 4. PROCEDURAL REQUISITES

4.1. Plaintiff has satisfied all procedural requisites to the filing of this suit.

## 5. FACTS

5.1. Houston Methodist hired Plaintiff to be the Patient Access Services Manager at the Willowbrook Hospital in June 2021. Plaintiff had over twelve years of experience in healthcare, including ten years of management experience, and had a proven track record of leadership and success.

5.2. On February 15, 2022 Plaintiff reported to Human Resources that Plaintiff felt discriminated against. Later that same day, Plaintiff's supervisor, Heather Cheek threatened to fire Plaintiff. After that, Plaintiff accused Ms. Cheek of being a racist. HR then put Plaintiff on a paid suspension through March 2, 2022. On March 3, 2022, Houston Methodist's Human Resources Director, Elizabeth

       Acevedo, fired Plaintiff, in part because Plaintiff accused Ms. Cheek of being racist.

5.3. Houston Methodist's decision to fire Plaintiff is unlawful. Houston Methodist fired Plaintiff because of her race, because Plaintiff complained of race discrimination, and because Plaintiff complained of retaliation by Ms. Cheek, Houston Methodist fired Plaintiff just over two weeks after she first reported discrimination.

5.4. Plaintiff got off to a good start at Houston Methodist. Plaintiff earned high ratings in her 60-day evaluation from staff. Yet Ms. Cheek never saw fit to bestow any praise on Plaintiff, and instead questioned why staff seemed to favor Plaintiff.

5.5. By August 2021, Plaintiff had already observed Ms. Cheek mistreat an African American employee named Breyanna Brown. With no factual support or logical reasons, Ms. Cheek unilaterally decided that Ms. Brown could no longer work under Ms. Cheek and reassigned her to work in the Emergency Department instead.

5.6. Later in August 2021, Ms. Cheek asked Plaintiff to write a letter with false allegations against an African American Lab Director, Tamika Simon. Ms. Cheek wanted Plaintiff to accuse Ms. Simon of being unprofessional and aggressive, yet she had no facts to back up those allegations. As a result, Plaintiff politely declined Ms. Cheek's request.

5.7. Also in August 2021, Plaintiff learned that a co-worker, an African American woman named Cynetra Simon, was feeling mistreated and retaliated against by Ms. Cheek. Ms. Simon was a well-respected employee with over 20 years' experience at Willowbrook Hospital. Yet Ms. Cheek routinely disrespected her and

talked down to her. At one point prior to Plaintiff's hire, Ms. Cheek tried to fire Ms. Simon but was unsuccessful.

5.8. In November 2021, Ms. Simon experienced the tragic loss of her grandson. In preparation of a memorial dinner for Ms. Simon on behalf of the hospital, Ms. Cheek made an offensive remark to Plaintiff. Plaintiff was working on a menu for the dinner and Ms. Cheek asked her, "What do you guys eat?" This was offensive. It suggests that African Americans like Ms. Simon and Plaintiff have some unusual eating habits, when of course we enjoy the same foods all humans enjoy. Ms. Cheek was drawing a line between herself and African American subordinates – creating an "us" versus "them" distinction – when there was no cause for it.

5.9. In December 2021, Plaintiff hired Lauren Wolfe to be a Coordinator / Subject Matter expert. Ms. Wolfe is a white woman.

5.10. Early on, Plaintiff got some negative feedback about Ms. Wolfe from her African American coworkers. Ms. Wolfe made some of the African American coworkers uncomfortable because she spoke negatively about the neighborhood in which Willowbrook is situated. Ms. Wolfe also went out of her way to tell Plaintiff's African American coworkers that she had a "black boyfriend." There is nothing wrong with interracial relationships, but it is troubling and suspicious when a white person goes out of their way to state that they have a boyfriend of a different race. Why bring that up?

5.11. Plaintiff took these concerns under advisement, but Plaintiff wanted to see how Ms. Wolfe performed on the merits. Plaintiff wanted to give Ms. Wolfe time to settle in before taking steps to improve her interpersonal relationships with staff.

4

5.12. But by February 2022, Ms. Wolfe was having problems with her job performance. Ms. Wolfe herself told Plaintiff that she was uncomfortable and lacking in confidence in keeping up with her responsibilities. In response, Plaintiff advised Ms. Wolfe to keep a daily log where she could keep track of her day-to-day tasks and make notes about questions or concerns that came up along the way. That way, they could have follow-up discussions about the tasks Ms. Wolfe felt uncomfortable with and Plaintiff could offer concrete assistance or advice about those tasks. Plaintiff assured Ms. Wolfe that the log was not punitive – because it was not. It was a tool for Ms. Wolfe to gain constructive assistance.

5.13. On February 14, 2022, Ms. Cheek called Plaintiff into a meeting on short notice with Ms. Wolfe. A couple minutes prior to the meeting, Ms. Cheek finally told Plaintiff what the meeting was about: Ms. Wolfe was complaining about the daily log.

5.14. Ms. Wolfe launched into personal attacks against Plaintiff. Ms. Wolfe began crying, her face turned red, and she shook her fists as she accused Plaintiff of being mean and hostile. Plaintiff remained calm. Plaintiff reminded Ms. Wolfe that the daily log is not a punitive measure, but rather a way to help her feel more comfortable. Plaintiff reminded Ms. Wolfe that they had positive interactions since she started the log and that Ms. Wolfe had not complained before.

5.15. Plaintiff looked to Ms. Cheek for support, but found none. Plaintiff asked Ms. Cheek if she had done anything wrong and Ms. Cheek did not respond. Plaintiff asked Ms. Wolfe for examples of Plaintiff being mean and she had none, other than to say that she feels Plaintiff was angry because Plaintiff looked at her in the eyes

when they talk. Plaintiff calmly responded that she is a confident, comfortable African American woman.

5.16. The fact that Ms. Wolfe interpreted Plaintiff's confidence and professionalism as anger says more about Ms. Wolfe than it does about Plaintiff. It says that Ms. Wolfe only has one way of interpreting confidence from a superior that is African American – she misinterprets it as anger. Out of nowhere, Ms. Wolfe chose to bring up the fact that she has a black boyfriend. This too speaks volumes about how Ms. Wolfe perceives African American people, as though she has some pass to be biased because she happens to be in an interracial relationship.

5.17. Ms. Wolfe said she felt Plaintiff did not want her around but could not offer any evidence or explain why. Instead, she said that she no longer wanted to communicate with Plaintiff – her supervisor – and wanted to communicate with Ms. Cheek instead.

5.18. Plaintiff immediately recognized that she was in an untenable position. Her subordinate was refusing to speak with her or explain why, and Plaintiff's superior, Ms. Cheek, was refusing to support her or intervene. So, Plaintiff noted that she would reach out to HR for herself. Plaintiff told Ms. Cheek that she felt unsupported, and that she was afraid of retaliation if she needed to use her supervisory authority over Ms. Wolfe going forward. Plaintiff then got up and left the room while Ms. Cheek and Ms. Wolfe continued speaking.

5.19. Plaintiff emailed HR Manager, Kim Morton, around 1:00 am on February 15, 2022. Plaintiff noted that she felt discriminated against in the meeting with Ms. Wolfe and Ms. Cheek and that she feared retaliation. Ms. Morton responded around 9:00 am and offered to meet with Plaintiff at 11:00 am. In that meeting,

Ms. Morton and Julie Fitzgerald were present on behalf of HR. They learned all of the details about the February 14th meeting, as well as the fact that Ms. Wolfe had already made other African American employees uncomfortable. They learned that Plaintiff had already been trying to transfer away from Ms. Cheek, and that she had already applied for a position as a Telehealth Clinic Manager. Ms. Morton told Plaintiff she would help with the transfer process.

5.20. Later in the day on February 15, 2022, Ms. Cheek entered Plaintiff's office and immediately acted hostile and angry about a routine workplace issue. Ms. Cheek threatened to remove staff from Plaintiff's department until Plaintiff was "gone and out of here."

5.21. Plaintiff recognized these threats as retaliation and immediately called HR on speaker phone before Ms. Cheek could leave the room. Ms. Fitzgerald answered, and Ms. Morton later joined the call. Plaintiff asked HR if she was terminated because Ms. Cheek just threatened her job. Plaintiff told Ms. Fitzgerald and Ms. Morton that all of her fears of retaliation were coming true. Plaintiff asked Ms. Fitzgerald whether there was anything in her personnel file that would warrant removal of any of her staff. Ms. Fitzgerald said no.

5.22. On the spot – while Ms. Fitzgerald was still on speaker phone - Plaintiff asked for a transfer and Plaintiff told Ms. Cheek that she was being racist. In response, Ms. Cheek asked for Plaintiff's resignation. Plaintiff refused and asked for a transfer. Ms. Morton ended the call and instructed Plaintiff to go home for the day.

5.23. Little did Plaintiff know that Houston Methodist would never allow her to return to work again.

5.24. In the evening of February 15, 2022, Ms. Morton called Plaintiff and asked her to write a letter detailing her claims of discrimination and retaliation. Plaintiff submitted the requested letter on February 18th.

5.25. On February 22, 2022, HR Director Elizabeth Acevedo called Plaintiff and invited her to a meeting on February 23, 2022. She assured Plaintiff that she had not been fired, and that the only reason she was sent home was for her safety. She told Plaintiff her goal was to get Plaintiff back to work.

5.26. On February 23, 2022, Ms. Acevedo and Ms. Fitzgerald met with Plaintiff. Ms. Acevedo asked about Ms. Wolfe's fears about working with Plaintiff, but she mentioned no specifics about why Ms. Wolfe was afraid. Plaintiff noted that Ms. Wolfe is clearly uncomfortable having a manager that is African American.

5.27. Ms. Acevedo asked Plaintiff if she was still committed to the hospital and whether she would be willing to communicate with Ms. Cheek going forward. Plaintiff assured Ms. Acevedo that she remained committed to the hospital and that she could be professional and continue to work with Ms. Cheek.

5.28. Ms. Acevedo told Plaintiff to return to work on February 28, 2022. But on February 25, 2022, Ms. Morton told Plaintiff not to return yet because Houston Methodist was still investigating her claims. On March 1, 2022, Ms. Morton scheduled a meeting with herself, Ms. Acevedo, and Plaintiff for March 3rd.

5.29. On March 3, 2022, Ms. Acevedo and Ms. Morton met with Plaintiff and – out of the blue – fired her. For the first time, Plaintiff was told that employees had complained about her prior to February 15, 2022. Ms. Acevedo noted that, because Plaintiff called Ms. Cheek a racist, Houston Methodist wanted to end the employment relationship. She told Plaintiff that Ms. Cheek had already packed

up Plaintiff's personal belongings. She offered Plaintiff a proposed severance agreement.

5.30. On March 6, 2022, Plaintiff went to the hospital to collect her personal belongings and return company property. Amongst her personal belongings was a journal with all of the pages ripped out. This was the journal in which she had kept personal notes about things that were happening at work, including the February 15th meeting with Ms. Wolfe and Ms. Cheek. Two other personal journals were never returned.

5.31. Houston Methodist discriminated against Plaintiff because of her race and retaliated against Plaintiff for complaining about Ms. Cheek's bias. Houston Methodist fired Plaintiff, in part, because of unspecified allegations against her that were never investigated nor discussed with Plaintiff. This is not credible because, as recently as February 15, 2022, HR assured Plaintiff there was nothing in her file that warranted termination.

5.32. In the termination meeting, Houston Methodist's HR Director, Ms. Acevedo specifically referenced the fact that Plaintiff accused Ms. Cheek of racism as a reason why Houston Methodist wanted to end her employment. That is direct evidence of discrimination and retaliation.

## 6. CLAIM OF RACE DISCRIMINATION AND RETALIATION UNDER 42 U.S.C. § 1981

6.1. Plaintiff was treated differently and terminated in whole or in part based on her race, African American. Plaintiff engaged in "protected activity", by making a formal complaint and report of race discrimination to Defendant. Defendant made its decision to terminate and did terminate Plaintiff based in

whole or in part, on her complaint and report of race discrimination. Such action constitutes retaliation under Section 1981. The termination of Plaintiff caused her significant damages, including her loss of back pay, front pay, mental anguish and attorneys fees.

## 7. ATTORNEYS FEES

Plaintiff seeks her reasonable and necessary attorneys fees as a "prevailing party" under 42 U.S.C. § 1981.

## 8. JURY DEMAND

Plaintiff hereby demands a trial by jury.

## 9. PRAYER

WHEREFORE, Plaintiff respectfully requests that judgment be entered in her favor, awarding her:

    a.    back pay and benefits;

    b.    front pay and benefits;

    c.    mental anguish damages;

    d.    punitive damages;

    e.    attorneys fees;

    f.    prejudgment and postjudgment interest and,

    g.    costs of court.

Respectfully submitted,

**SHELLIST LAZARZ SLOBIN LLP**

*/s/ Mark G. Lazarz*
**Mark G. Lazarz**
TBA #12069100
5373 W. Alabama St., Suite 600
Houston, Texas 77056
mlazarz@eeoc.net
Telephone:  (713) 621-2277
Facsimile:  (713) 621-0993

**ATTORNEYS FOR PLAINTIFF**